**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 11-cr-00376-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

**1.     EXECUTIVE RECYCLING, INC.,**
**2.     BRANDON RICHTER, and**
**3.     TOR OLSON**,

      Defendants.

_____

**ORDER ON DEFENDANTS TOR OLSON'S AND**
**BRANDON RICHTER'S MOTIONS FOR NEW TRIAL**
_____

In this action, the Government charges Defendants Executive Recycling,

Brandon Richter, and Tor Olson with eleven counts of wire fraud (18 U.S.C. § 1343),

two counts of mail fraud (18 U.S.C. § 1341), one count of a violation of the Resource

Conservation and Recovery Act ("RCRA") (42 U.S.C. § 6928(d)(4) and 6 C.C.R. 1007-3

§ 262.53), one count of smuggling (18 U.S.C. § 554), and one count of obstruction of

justice (18 U.S.C. § 1519).  (ECF No. 1.)  In summary form, the Government charged

that Defendants (1) falsely represented to various businesses and government entities

in Colorado that Defendants would dispose of the entities' electronic waste in an

environmentally friendly manner and in compliance with all applicable local, state, and

federal laws and regulations (Counts 1-13, hereafter referred to as the "Fraud Counts");

(2) illegally transported and exported a shipment of electronic waste that included

cathode ray tubes ("CRTs") containing lead (Counts 14-15, hereafter the "Exportation

Counts"); and (3) destroyed evidence with the intent to impede the Government's investigation of them (Count 16).  (*Id.*)

After ten days of hearing evidence and three days of deliberation, the jury returned a mixed verdict.  Defendant Brandon Richter was convicted on nine of sixteen counts (ECF No. 271-16) and Defendant Tor Olson was convicted on eight of sixteen counts (ECF No. 271-17).  Both Defendants were convicted on seven Fraud Counts and one Exportation Count.  Defendant Richter was convicted on Count 16 while Defendant Olson was acquitted on this count.

Before the Court are Defendant Richter's Motion for New Trial (ECF No. 279) and Defendant Olson's Motion for a New Trial (ECF No. 278) (together "Motions").  For the reasons set forth below, the Motions are denied.

## I.  LEGAL STANDARD

Rule 33(a) of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "[I]n deciding a motion for new trial, the court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred."  *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994) (quotation marks and citation omitted).  "The Court's broad discretion empowers it to grant relief based not only on the sufficiency *vel non* of the evidence at trial but on any other circumstance that might render the trial 'essentially unfair,' including trial errors."  *United States v. D'Amelio*, 636 F. Supp. 2d 234, 238 (S.D.N.Y. 2009).

However, "[d]istrict courts view motions for new trials with disfavor." *United States v. Lamy*, 521 F.3d 1257, 1266 (10th Cir. 2008).   "[A] litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (alteration, internal quotation marks, and citation omitted).   "The jury's verdict must be allowed to stand unless the evidence weighs heavily enough against the verdict such that a miscarriage of justice may have occurred." *United States v. Sturdivant*, 513 F.3d 795, 802 (8th Cir. 2008) ("[T]he authority to grant a new trial should be exercised sparingly and with caution."); *see also Richins v. Deere & Co.*, 231 F.R.D. 623, 625 (D.N.M. 2004) (an "alleged error by the trial court constitutes grounds for granting a new trial only where the trial court concludes that, absent the alleged error, a jury would likely have reached a contrary result.").

## II.  ANALYSIS

Richter's Motion raises two alleged errors: (1) the Court's denial of counsel's mid-trial oral Motion to Withdraw; and (2) the Court's jury instruction on the definition of "waste".  (ECF No. 279.)  Olson's Motion raises four alleged errors: (1) the Court's "waste" instruction; (2) admission of improper expert testimony; (3) failure to give two instructions requested by Defendants; and (4) the Court's ruling on two evidentiary issues.  (ECF No. 279.)  The Court will address each issue in turn below.  Because the parties and the Court are intimately familiar with the factual and procedural history of this case, the Court will limit its discussion of the background to only that necessary for the instant analysis.

**A.      Mr. Richter's Counsel's Mid-Trial Motion to Withdraw**

On December 9, 2012, the Sunday after the first full week of the jury trial of this matter, counsel for Brandon Richter filed a Motion to Withdraw.  (ECF No. 250.)  The Motion was premised on an alleged conflict between Mr. Richter's counsel's obligations to provide zealous representation for Mr. Richter and her obligations under a Joint Defense Agreement ("JDA") which she had entered into with Mr. Olson's counsel.  (*Id.*)

The Court held argument on the Motion to Withdraw at the end of the sixth day of trial, December 10, 2012, and the Government filed its written opposition to the motion that evening.  (ECF Nos. 256-57.)  On the morning of the seventh day of trial, December 11, 2012, the Court held additional argument on the Motion to Withdraw and thereafter orally denied the Motion.  (ECF No. 261.)  The same afternoon, the Court issued a written order setting forth its basis for denying the Motion.  (ECF No. 258.)  The Court held that counsel had failed to show an actual conflict of interest and that the balance of the equities weighed in favor of denying the Motion to Withdraw.  (*Id.*)

In Mr. Richter's Motion for New Trial, he contends that the Court's denial of the Motion to Withdraw was error and that such error was so significant as to have denied him a fair trial.  (ECF No. 279 at 3-5.)  Richter asks that the Court grant him a new trial where he can be represented by conflict-free counsel.  (*Id*. at 5.)

The instant Motion raises no new arguments; it simply reiterates the same arguments previously raised during trial.  The Court has reviewed the fourteen page written order denying the Motion to Withdraw that it issued on December 11, 2012 and sees no reason to reconsider its ruling or the bases set forth therein.  Additionally,

4

because Richter does not raise any new arguments here, the Court finds that further discussion is unnecessary.  Rather, the Court incorporates herein its reasoning and findings set forth in its December 11, 2012 Order Denying Counsel for Executive Recycling and Brandon Richter's Motion to Withdraw.  (ECF No. 258.)

Mr. Richter's Motion for New Trial is denied to the extent it seeks a new trial based on any alleged conflict with his counsel.

**B.    Evidentiary Issues**

Defendant Olson argues that the Court made at least three errors with respect to evidentiary issues during the trial:  (1) admission of Exhibit 515; (2) failure to admit prior statements of Tor Olson; and (3) permitting the Government to call Edward Smith as a rebuttal witness.  The Court will address each of these arguments below.

1.    Exhibit 515

The Indictment in this case stated that Executive Recycling "appeared as the exporter of record in over 300 exports from the United States between 2005 and 2008".  (ECF No. 1 ¶ 6.)  This allegation was based on hundreds of Shipper's Export Declarations ("SED") that had been filed with the Department of Commerce and which listed Executive Recycling as the "U.S. Principal Party in Interest".  (*See* ECF No. 131-1.)

Before the jury was brought in on the fifth day of trial, the Court heard argument about the admission of Exhibit 515, a summary chart prepared by the Government based on the information contained in the SEDs[1] and which the Government sought to

---

[1]  The actual SEDs were Government's Exhibit 420.  Because the Court admitted the summary chart, the Government did not offer Exhibit 420 into evidence.

admit pursuant to Federal Rule of Evidence 1006.  Exhibit 515 listed Executive

Recycling as the "exporter" of a number of shipments.  The Government sought to

admit Exhibit 515 based on the testimony of Omari Wooden, an employee at the United

States Census Bureau.  Defendants objected to admission of Exhibit 515 on the basis

that the SEDs contained double hearsay and were not reliable.  The Court overruled

the objection and read a limiting instruction[2] before Exhibit 515 was shown to the jury.

Defendant Olson now argues that admission of Exhibit 515 was error because

the SEDs which formed the basis for this summary exhibit were not themselves

admissible as they contained double hearsay.  (ECF No. 278 at 12.)  "Double hearsay

---

[2]  The Court instructed the jury as follows:

> You will later be instructed that Counts 14 and 15 of the
> Indictment charge Defendants with violating export provisions
> promulgated by the Environmental Protection Agency.
> As you may know, the Federal Government has multiple
> agencies that oversee different aspects of exportation of materials
> from the United States to other countries.  Two of these agencies
> are the Environmental Protection Agency and the Department of
> Commerce.  The Department of Commerce has regulations which
> require that certain documents be filed when a shipment goes
> overseas from the United States.  The exhibit you are about to be
> shown uses the term "Exporter" as that term is defined by the
> Department of Commerce's regulations.  You should keep in mind
> that Defendants in this case are not charged with violating any
> regulation promulgated by the Department of Commerce.  The
> Department of Commerce's export regulations are different than
> the Environmental Protection Agency's export regulations.
> The Government is offering Exhibit 515 to support its
> contention that Defendants exported materials to other countries
> contrary to their representations to customers that they would not
> export.  This Exhibit is not intended to show that Defendants
> violated any export requirement of the Environmental Protection
> Agency.  Therefore, you should not consider Exhibit 515 when
> you are determining whether the Government has proven a
> violation of the export regulations implemented by the
> Environmental Protection Agency, as charged in Counts 14 and
> 15 of the Indictment.

in the context of a business record exists when the record is prepared by an employee with information supplied by another person." *United States v. Gwathney*, 465 F.3d 1133, 1141 (10th Cir. 2006).  At trial, it was undisputed that the information in the SEDs was entered into to the United States Customs Service's online Automated Export System by an entity other than Executive Recycling.  Thus, it was undisputed that the SEDs contain double hearsay.

If the person who provides the information contained in a record is an outsider to the business and is not under a business duty to provide accurate information, then the reliability rationale that underlies the business records exception ordinarily does not apply.  *See United States v. Ary*, 518 F.3d 775, 787 (10th Cir. 2008) ("The essential component of the business records exception is that each actor in the chain of information is under a business duty or compulsion to provide accurate information.  If any person in the process is not acting in the regular course of business, then an essential link in the trustworthiness chain fails."); *United States v. Snyder*, 787 F.2d 1429, 1433-34 (10th Cir. 1986) ("The business records exception is based on a presumption of accuracy, accorded because the information is part of a regularly conducted activity, kept by those trained in the habits of precision, and customarily checked for correctness, and because of the accuracy demanded in the conduct of the nation's business. The reason underlying the business records exception fails, however, if any of the participants is outside the pattern of regularity of activity.") Accordingly, the general rule is that "[a]ny information provided by . . . an outsider to the business preparing the record[ ] must itself fall within a hearsay exception to be admissible." *Gwathney*, 465 F.3d at 1141; see also Fed. R. Evid. 805 ("Hearsay

7

included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.").

However, the Tenth Circuit has recognized one exception to this general rule: information provided by an outsider that is included in a business record may come in under the business records exception "[i]f the business entity has adequate verification or other assurance of accuracy of the information provided by the outside person." *United States v. McIntyre*, 997 F.2d 687, 700 (10th Cir. 1993); *see also United States v. Cestnik*, 36 F.3d 904, 908 (10th Cir. 1994). In the context of identity information provided by an outsider, there are "two ways to demonstrate this 'guarantee[ ] of trustworthiness': (1) proof that the business has a policy of verifying [the accuracy of information provided by someone outside the business]; or (2) proof that the business possesses 'a sufficient self-interest in the accuracy of the [record]' to justify an inference of trustworthiness." *Cestnik*, 36 F.3d at 908 (quoting *United States v. McIntyre*, 997 F.2d 687, 700 (10th Cir. 1993)).

Here, the Court found that there was sufficient evidence to allow it to conclude that the entity responsible for inputting the information into the SEDs was under a business obligation to provide accurate information. Mr. Wooden testified that an SED was required to be filed whenever goods valued at over $2,500 were being exported from the United States. He testified that, with respect to about seventy percent of the shipments, the freight forwarder would file the SED and that doing so was part of the forwarder's ordinary course of business. With respect to reliability of the information contained in an SED, Mr. Wooden testified that the automated system had a number of

8

controls; specifically, any company who wanted to file automated SEDs was required to register with United States Customs Services and was given a company-specific username and password.  Additionally, providing false information in an SED is punishable by up to a $10,000 fine and possible imprisonment.

Based on Mr. Wooden's testimony, the Court stands by its prior ruling with respect to Exhibit 515.  Given the security measures built into the automated system and the penalties associated with providing false information, the Court finds that the information provided to the freight forwarders had sufficient indicia of reliability to enable the SEDs to fall within the business records exception despite the fact that they contained information input by freight forwarders.  *See Cestnik*, 36 F.3d at 908. Therefore, the Court finds that Exhibit 515 was properly admitted under the business records exception.

Mr. Olson also appears to argue that admission of Exhibit 515 was overly prejudicial.  However, in advance of Mr. Wooden's testimony, the Court notified the parties that, if it found the Government had laid the proper foundation for Exhibit 515, it intended to give a limiting instruction to the jury.  After being read such instruction, Mr. Olson's counsel stated that he did not object to the limiting instruction.  Mr. Richter's counsel stated that she felt the limiting instruction would cure any prejudice that would be caused by admission of Exhibit 515.  Therefore, the Court finds Mr. Olson's prejudice argument to have been waived.  Moreover, even if it had not been waived, the Court finds that the limiting instruction cured any prejudice which could have arisen from the fact that Exhibit 515 listed Executive Recycling as the exporter for a number of overseas shipments.

Finally, to the extent that admission of Exhibit 515 was erroneous, Olson has failed to show that such error was so egregious as to warrant a new trial.  In order to secure a new trial based on an allegedly improper evidentiary ruling, a defendant must show that the evidentiary rulings were both clearly erroneous and so prejudicial that "it can be reasonably concluded that with or without such evidence, there would have been a contrary result."  *Hinds v. General Motors Corp.*, 988 F.2d 1039, 1049 (10th Cir. 1993).  "Neither an error in the admission or exclusion of evidence nor an error in a ruling or order of the court, nor anything done or omitted by the court, can be grounds for granting a new trial unless the error or defect affects the substantial rights of the parties."  *Stewart v. S. Kan. & Okla. R.R., Inc.*, 36 F. Supp. 2d 919, 920 (D. Kan. 1999).

In this case, Defendant Olson has failed to show that, but for the admission of Exhibit 515, he would have been acquitted on the charges brought against him.  In fact, there was significant evidence, in addition to Exhibit 515, that showed Executive Recycling had exported a number of shipments overseas.  Ex-employees testified about regularly loading electronics into shipping containers which were then exported to vendors overseas.  There was also testimony from a freight forwarder (Crown Container) and a shipper (Evergreen Shipping) about overseas shipments that originated from Executive Recycling.  Therefore, the Court has little difficulty concluding that, even if admission of Exhibit 515 was error, Mr. Olson is not entitled to a new trial on this basis.

### 2.    Olson's Statements

Mr. Olson next argues that the Court erroneously prevented him from entering into evidence a number of e-mails he had sent during the time period of the

10

alleged conspiracy.  (ECF No. 278 at 13-14.)  Mr. Olson sought to introduce this evidence during his direct examination and the Government objected, taking the position that these e-mails were Mr. Olson's prior statements being offered for the truth of the matter asserted and, therefore, inadmissible hearsay.  Mr. Olson argued that they were admissible as verbal acts, because they were prior consistent statements rebutting the implication that Mr. Olson fabricated something, and because they showed his mental state.  The Court sustained the Government's objection and did not allow admission of the e-mails.  (*See* T-113, T-243, & T-292.)

Mr. Olson now argues that these evidentiary rulings were erroneous and that the exclusion of this evidence was so prejudicial as to deny him a fair trial.  (ECF No. 278 at 14-15.)  Mr. Olson contends that, because the jury arrived at a mixed verdict on the fraud counts, any evidence showing a lack of intent to defraud—as these e-mails were intended to show—was particularly important.  (*Id*. at 15.)

The Court has reviewed the transcript and sees no reason to reconsider its ruling at trial.  The Court notes that it did not exclude all e-mails drafted or sent by Tor Olson.  Rather, when it found that e-mails were being offered to show that Mr. Olson directed employees to take certain actions, and not for the truth of the matter asserted (which would have been to show that those actions were actually taken), the Court allowed those e-mails into evidence.  When e-mails were excluded, it was because the Court found that, despite counsel's argument to the contrary, they were being offered for the truth of the matter asserted and that there was no applicable hearsay exception.  None of the authority cited by Defendant leads the Court to conclude that its rulings were error.

Moreover, even assuming the exclusion of one or more of these e-mails were error, Defendant Olson has not demonstrated that such an alleged error entitles him to a new trial.  Mr. Olson was permitted to testify about the substance of the e-mails; the Court simply excluded admission of the actual e-mails themselves.  For example, the Court sustained the objection to Exhibit T-113 and barred its admission into evidence. Exhibit T-113 was an e-mail sent by Tor Olson to all employees outlining each employees' job duties.  After the Court ruled that the actual e-mail was inadmissible, Mr. Olson testified about each employees' job duties at the time the e-mail was sent.  Mr. Olson was also permitted to testify that he "communicated" what each employees' duties were to all of the other employees.  Therefore, the Court finds that Mr. Olson was not denied the opportunity to present a complete defense simply because he was not permitted to introduce the actual e-mails into evidence.

3.    Testimony of Edward Smith

The final evidentiary issue that Defendants raise in the instant Motions pertains to the testimony of Edward Smith, who the Government called as a witness during its rebuttal case.  Mr. Smith is a long-time employee of the Colorado Department of Public Health and Environment ("CDPHE") who participated in an inspection of Executive Recycling's facilities for the purpose of ensuring compliance with Colorado's Universal Waste regulations.

In the instant Motion, Mr. Olson contends that some of Mr. Smith's testimony was impermissible expert testimony.  Specifically, Mr. Olson objects to the portion of Mr. Smith's testimony about what constitutes "waste" under Colorado regulations.  Mr. Smith testified that taking a CRT tube out of its housing and using it to make another

12

CRT is not using the CRT "for its original intended purpose".  This testimony directly rebutted Mr. Richter's testimony.

Mr. Olson first argues that this testimony was error because Mr. Smith was not disclosed as an expert witness.  The Government disputes whether any portion of Mr. Smith's testimony was "expert" testimony.  However, even to the extent it was expert testimony, the Government argues that it was not required to disclose Mr. Smith as an expert because he was called in its rebuttal case.  (ECF No. 287 at 9-11.)

Having reviewed the pertinent rules, the Court agrees with the Government. Federal Rule of Criminal Procedure 16(1)(G) requires the Government to disclose "a written summary of any [expert] testimony that the government intends to use . . . during its case-in-chief at trial."  *See also United States v. Swisher*, 360 F. App'x 784, 185 (9th Cir. 2009) (Rule 16(1)(G)'s disclosure requirements do not apply to rebuttal experts); *United States v. Frazier*, 387 F.3d 1244, 1269 (11th Cir. 2004) ("[T]he government's presentation of rebuttal [expert] testimony without notice does not violate Rule 16, since the Rule's notice requirements apply only to the government's case-in-chief."). Defendant has cited no authority for its position that any additional disclosure was required.  Accordingly, even assuming that Mr. Smith's testimony was expert in nature, it was not error to permit such testimony without prior disclosure.[3]  *See Davis v. Workman*, 695 F.3d 1060, 1078 (10th Cir. 2012) (no due process violation when expert who had not been previously disclosed was permitted to testify during prosecution's rebuttal case).

---

[3]    The Court notes that Mr. Smith was disclosed as a possible witness well in advance of trial and the Defendants were also on notice about the general nature of his testimony. Thus, the fact that Mr. Smith would testify about his understanding of Colorado's Universal Waste regulations should not have been a complete surprise.

Mr. Olson also argues that Mr. Smith's testimony was improper because it invaded the province of the jury by answering the ultimate question of whether the CRTs at issue in this case were "waste" under the Colorado regulations.  (ECF No. 278 at 4-5.)  Defendants are correct that whether the CRTs at issue in this case were waste was an ultimate question of fact for the jury to determine.  However, Mr. Smith's testimony was not required to be excluded simply because it touched on an ultimate question of fact.  *See* Fed. R. Evid. 704; *United States v. Logan*, 641 F.2d 860, 863 (10th Cir. 1981).  "Instead, the proper inquiry is whether the testimony 'would assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *United States v. Buchanan*, 787 F.2d 477, 483 (10th Cir. 1986) (quoting Fed. R. Evid. 702).

In cases involving complex regulatory schemes, a witness may be permitted to testify about how the law applies to a certain set of facts.  *Id*. at 477 (permitting expert testimony on whether a particular homemade device constituted a "firearm" under the governing regulations because it was a complex issue that involved "an array of statutory definitions."); *Logan*, 641 F.2d at 863 (finding no abuse of discretion in admitting expert testimony about how certain funds were classified under the law).  Although it is a close call, because this was a complex environmental action involving application of a series of regulations, the Court does not find that Mr. Smith's testimony improperly invaded the province of the jury.

Moreover, even if Mr. Smith's testimony did encroach on the jury's province as the finder of fact, any prejudice to Defendants was minimized by the pertinent limiting instruction the Court gave to the jury.  After Mr. Smith's testimony, the Court instructed the jury as follows:

14

You have heard the testimony from Mr. Edward Smith.  Portions of Mr. Smith's testimony touched on some of the laws and regulations applicable to the Electronics Recycling industry.  The Court has previously ruled that Mr. Smith's testimony is admissible.  However, it is the role of the Court to instruct you as to the law that governs this case.  After all the testimony is complete and the parties have offered all their evidence, the Court will give you a set of instructions that will set forth the law that must govern your deliberations.

When determining whether defendants have violated the applicable law and regulations, the Court's instructions and only these instructions, must guide your deliberations.  To the extent that Mr. Smith's testimony describes the law — or described the law — in some way that is inconsistent with how the Court will later instruct you, you must disregard his testimony.  The Court's instructions on the law that governs this case must guide your deliberations.

The Court must presume that the jury followed this instruction.  *United States v. Greschner*, 802 F.2d 373, 381 (10th Cir. 1986).  Therefore, the Court finds that any error associated with allowing Mr. Smith's testimony did not deprive Defendants of a fair trial.

Accordingly, Defendant Olson's Motion for New Trial is denied to the extent it seeks a new trial based on allegedly erroneous evidentiary rulings.

## C.    Jury Instructions

Defendants also move for a new trial based on alleged errors in the Court's jury instructions.  (ECF Nos. 278 & 279.)  Mr. Olson takes issue with the Court's failure to include two instructions proposed by Defendants in its final charge the to jury.  (ECF No. 278 at 8-11.)  Additionally, both Defendants argue that the Court's "Waste—Defined" instruction was error.  (ECF No. 278 at 3-7; ECF No. 279 at 6-11.)  The Court will address each of these issues in turn below.

15

1.    Defendants' Proposed Instruction P

Before trial commenced, Defendants submitted the following Proposed

Instruction P:

> A defendant who acts in reliance on public authority does not act knowingly, or with the intent to defraud, and should be found not guilty.
>
> A defendant acts under public authority if:
>
> (1)  the defendant is affirmatively misled by a government official as to the state of the law;
> (2)  the defendant actually relies on what the government official tells him in taking the action; and,
> (3) the defendant's reliance on what he was told by the government official is reasonable in light of the circumstances.
>
> The government official making misrepresentations must be one who is responsible for interpreting, administering, or enforcing the law defining the offense.
>
> In considering whether a defendant actually and reasonably relied on representations by an official that his conduct was lawful, you should consider all of the circumstances of the representations, including the identity of the official, the point of law misrepresented, and the substance of the misrepresentation.
>
> Authority:  *See* 7th Cir. Crim. PJI 6.06 and 6.07; *see United States v. Hardridge*, 379 F.3d 1188. 1192-1197 (10th Cir. 2004) ("to convict a citizen following [] an 'active misleading' would be to dispense with the basic requirement that citizens receive fair warning of what actions are criminal"); *citing Raley v. Ohio*, 360 U.S. 423, 426 (1959) and *Cox v. Louisiana*, 379 U.S. 559, 571 (1965).

(ECF No. 177 at 21.)  The Court did not include this instruction in its final instructions to

the jury.  (ECF No. 271-7.)

Proposed Instruction P is essentially a recitation of the elements of the "entrapment by estoppel" affirmative defense.[4]  *See United States v. Hardridge*, 379 F.3d 1188 (10th Cir. 2004).  Defendants argue that they presented sufficient evidence at trial to support an entrapment by estoppel defense and, therefore, the Court should have included Proposed Instruction P in its final instructions.  (ECF No. 278 at 8.)

"While a defendant is entitled to an instruction on his theory of defense where some evidence and the law supports the theory, such an instruction is not required if it would simply give the jury a clearer understanding of the issues."  *United States v. Bowling*, 619 F.3d 1175, 1183-84 (10th Cir. 2010) (internal quotation omitted).  "[A] theory of defense instruction is required only if, without the instruction, the district court's instructions were erroneous or inadequate."  *United States v. Williams*, 403 F.3d 1188, 1195 (10th Cir. 2005).

Defendants contend that there was sufficient evidence to require the Court to give an entrapment by estoppel instruction.  (ECF No. 278 at 8.)  Specifically, Defendants point to Mr. Olson's testimony that early in the company's history—around 2005—Executive Recycling participated in a "generator assistance" program conducted by the CDPHE.  Mr. Olson testified that sometime during or following that program, an official at CDPHE indicated that the agency "hundred percent backed what the

---

[4]  Although Defendants' Proposed Instruction P includes language suggesting that Defendants were asserting a "public authority" defense, it is clear to the Court that they intended to present an "entrapment by estoppel" defense.  "The public authority defense requires a defendant to show that he was engaged by a governmental official to participate in a covert activity."  *United States v. Apperson*, 441 F.3d 1162, 1204 (10th Cir. 2006).  There was no allegation that any public official engaged the Defendants to participate in a covert activity and, therefore, the Court considers only whether Defendants were entitled to an entrapment by estoppel instruction.

company was doing and that was the best way to recycle, anything that we could reuse, resell, refurbish, prior to decommissioning."  Defendants also point to a 2003 Memorandum issued by CDPHE which was admitted into evidence and stated that electronic materials did not become waste "until the recycler determines that the equipment and/or its components are not longer useable".

       a.    *Applicability When Representations Are Made By State Officials*

The Government first argues that the entrapment by estoppel instruction was not supported by the evidence because this case involved charges brought under <u>federal</u> statutes and regulations, and there was no evidence that Defendants relied on any affirmative representations from a <u>federal</u> official.  (ECF No. 287 at 11; ECF No. 184 at 29.)

It is well established that the estoppel by entrapment defense is not available to a defendant facing federal charges if the defendant is relying on misrepresentations made by state officials.  *See United States v. Rector*, 111 F.3d 503, 506 (7th Cir. 1997); *United States v. Etheridge*, 932 F.2d 318, 322 (4th Cir. 1991) (to permit the entrapment by estoppel defense on federal charges when misstatements were made by state officials "would penalize the wrong government—the government that prosecuted the appellant rather than the government that mistakenly and misleadingly interpreted the law."); *United States v. Bruscantini*, 761 F.2d 640, 641-42 (11th Cir. 1985) (same).

With respect to the Fraud Counts,[5] the Court agrees with the Government that

---

[5]  Defendants do not specify whether the Court should have given Proposed Instruction P with respect to the Fraud Counts (Counts 1-13) or on the Exportation Counts (Counts 14-15). Because it is unclear, the Court will consider its propriety of Proposed Instruction P as to each of these categories of offenses.

the fact that no federal official made representations to Defendants bars application of the entrapment by estoppel defense.  Defendants were charged with federal mail and wire fraud based on promises made to customers about how their electronic materials would be handled.  CDPHE is not charged with interpreting, administering, or enforcing federal wire and mail fraud statutes.  The fraud claims did not include any cross-reference to state law and no key terms were defined by state regulations.  Therefore, Defendants cannot assert entrapment by estoppel as a defense to the federal wire and mail fraud counts brought in this case.[6]  *See Hardridge*, 379 F.3d at 1192 (affirmative misrepresentations must be made by a government agent "responsible for interpreting, administering, or enforcing the law defining the offense.").

On the other hand, the Court finds that the entrapment by estoppel claim was not barred by the lack of involvement by federal officials in so far as Defendants sought to argue it as a defense to Count 15.  Count 15 charged Defendants with exportation of

---

[6]  Aside from this hurdle, the Court also finds that there was insufficient evidence introduced at trial to permit the entrapment by estoppel instruction on the fraud claims.  The purpose of Instruction P would have been to help the jury understand the *mens rea* requirement of the Fraud Counts, and specifically to show that Defendants did not act with specific intent to defraud.  However, the evidence of reliance on CDPHE officials or CDPHE interpretive guidance went only to whether or not the exportation of certain electronic materials was legal, which was not the Government's theory of the case on the Fraud Counts. Rather, the Government proved its fraud claims with evidence that Defendants made a series of material misrepresentations, including statements that the materials would be handled domestically by certain environmentally responsible recyclers, that nothing would be shipped overseas (legally or illegally), and that certain materials would be shredded, decommissioned or otherwise destroyed at Defendants' facilities.  In other words, the Government's fraud case was not dependent on the legality or illegality of the manner in which Defendants handled the electronic materials under Colorado's Universal Waste laws; the fraud was the fact that the materials were shipped overseas at all or otherwise handled in a manner inconsistent with the promises made by Defendants.  Therefore, any representations by CDPHE officials about the legality of Defendants' actions under Colorado's Universal Waste regulations were not material to the Fraud Counts.

CRTs contrary to 18 U.S.C. § 554, which is clearly a federal statute.  This would suggest that, as discussed above, the fact that the only representations made to Defendants came from state officials would bar the defense in this case.  However, unlike the wire and mail fraud counts, Count 15 was dependent on Colorado regulations and interpretations thereof based on Colorado law.  Most significantly, the issue of when electronic materials became a "waste" (a clear condition precedent to any finding that a material was a "hazardous waste") is governed by Colorado's Universal Waste laws.  CDPHE is the Colorado state agency tasked with interpreting, administering, and enforcing such laws.  Therefore, unlike on the fraud claims, the Court finds that Defendants are not barred from pursuing an entrapment by estoppel defense on Count 15 simply because the affirmative representations were made by state officials.

> b.    *Sufficient Evidence to Support Instruction*

The Government also argues that there was not sufficient evidence to permit the Court to give Defendants' Proposed Instruction P.  (ECF No. 287 at 11.)  In response, Defendants point to the fact that CDPHE "hundred percent backed" Executive Recycling's business model and also to the 2003 Memorandum which reiterated when a material becomes waste.

The Court finds that this evidence was not sufficient to entitle Defendants to the entrapment by estoppel instruction.  Mr. Olson testified in a very general manner that CDPHE officials "hundred percent backed" Executive Recycling's business model. However, there was no evidence that any of the CDPHE officials who made these statements were aware that Defendants were exporting CRTs overseas without filing the required documentation and/or obtaining the required permission from the receiving

20

country (which was the violation charged in Count 15).  CDPHE's general approval of a business that was just getting off the ground, without any context as to what CDPHE understood  Executive Recycling's business model to be, is not sufficient to warrant an entrapment by estoppel instruction.

Similarly, the Court does not find that the 2003 Memorandum was sufficient to support the instruction.  The Memorandum was not an affirmative statement that Defendants' business practices, such as they were at the time, were lawful.  Nothing in the Memorandum addressed what documentation was necessary when exporting CRTs and nothing excused Defendants from obtaining the consent of the receiving country.  The 2003 Memorandum simply restated Colorado's Universal Waste regulations.[7]

Significantly, entrapment by estoppel is an affirmative defense "that is rarely available."  *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994).  The situation in this case is distinguishable from the vast majority of the cases in which entrapment by estoppel has been applied.  Most cases discussing entrapment by estoppel involved status offenses such as being a felon-in-possession of a firearm, obstruction of justice by protesting too close to a courthouse, or being unlawfully present in the United States.  *See, e.g., Cox v. State of Louisiana*, 379 U.S. 559 (1965) (prosecution of protestors for holding protest too close to courthouse violated Due Process when state

---

[7]  Notably, CDPHE issued subsequent guidance on the proper interpretation of the Universal Waste regulations.  In particular, a Memorandum was issued in 2004 which clarified that any resale, reuse or refurbishment had to be for the original intended purpose for the electronic material not to be considered waste.  This 2004 Memorandum was found in Executive Recycling's office at the time the search warrant was executed.  Therefore, it is questionable whether any reliance by Defendants on the 2003 Memorandum at the time of the events charged in Count 15 was reasonable.

had issued permit for the time and place protest was held); *United States v. Ormsby*, 252 F.3d 533 (6th Cir. 2001) (where gun permit issued by county sheriff's office and defendant later charged with felon-in-possession of a firearm); *United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1167 (10th Cir. 1999) (defendant was issued a work permit by the INS and then later charged with being unlawfully present in the United States).

In these other cases, a government representative had affirmatively informed the defendant that the exact conduct charged (*e.g.*, possessing a firearm, protesting in a particular location, or being present in the United States), was lawful.  In this case, there was no evidence that anyone at CDPHE, either a particular individual or the agency itself  through written correspondence, specifically informed Defendants that the CRTs they were exporting overseas were not waste.  There was also no evidence that CDPHE specifically informed Defendants that they were not required to file a Notice of Intent to Export or obtain permission from the receiving country before exporting the CRTs. Thus, there was not sufficient evidence to require that the Court give an instruction on entrapment by estoppel with respect to Count 15.

The Court instructed the jury on the relevant Universal Waste regulations, as well as the specific intent required to convict on Count 15.  (ECF No. 271-7.)  Defendants were permitted to argue that they lacked the *mens rea* necessary to convict them on this Count and, in so arguing, were not forbidden from referring to statements made by CDPHE, including both the "hundred percent backing" of the agency and the 2003 Memorandum.  The Court finds that its instructions, considered as a whole, were

sufficient to instruct the jury on the status of the law, including the proper *mens rea*

necessary to convict the Defendants on Count 15.  Therefore, the Court finds that

Defendants are not entitled to a new trial based on the Court's refusal to include

Proposed Instruction P in its final charge to the jury.   *See United States v. Bader*, 678

F.3d 858 (10th Cir. 2012) (in determining whether district court properly instructed jury,

the reviewing court must look at the instructions as a whole).

Moreover, to the extent that it was error to refuse Defendants' Proposed

Instruction P, the Court finds that any such error would only affect Defendants'

conviction on Count 15.  As set forth above, it is clear that the instruction was not

applicable to the Fraud Counts, as there was no evidence that any governmental official

affirmatively misled Defendants about the lawfulness of misrepresenting to customers

how, when, and where their electronic materials would be handled.  Thus, even

assuming that the failure to give Proposed Instruction P was error, the Court finds that

such error would, at most, only affect Count 15.

2.   Defendants' Proposed Instruction Q

Before trial commenced, Defendants submitted the following Proposed

Instruction Q:

> The defendants have asserted a defense of good
> faith.  Good faith is a complete defense to the charges in
> count 14 because good faith on the part of the defendants is
> simply inconsistent with knowingly failing to file the
> notification paperwork.
>
> A person who acts, or fails to act, based on a belief or
> an opinion honestly held by him that a notification of intent to
> export is not required to be filed, or that such requirement
> does not apply to him, is not punishable for knowingly failing
> to file notification when such notification is required, even if

his belief is mistaken.  An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct.

The law is written to subject criminal punishment to only those people who knowingly fail to file notification when such notification is required.  While the term "good faith" has no precise definition, it encompasses, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another.  In determining whether or not the government has proved that the defendants knowingly failed to file notification when such notification was required, or whether they acted in good faith, you must consider all the evidence received in the case bearing on the defendants' state of mind.

The burden of proving good faith does not rest with the defendants because they do not have any obligation to prove anything to you in this case.  It is the government's burden to prove to you, beyond a reasonable doubt, that the defendants failed to file notification knowing that such notification was required and knowing that such requirement applied to the defendants.

If the evidence in this case leaves you with a reasonable doubt as to whether a defendant failed to file notification knowing that such notification was required to be filed and knowing that such requirement applied to defendants, you must find that defendant not guilty.

<u>Authority</u>:  1A Kevin F. O'Malley, Jay E. Grenig, Hon. William C. Lee, Federal Jury Practice and Instructions § 19.06 (6th ed. 2012), as modified.

(ECF No. 177 at 22.)  The Court did not include this instruction in its final charge to the

jury.  (ECF No. 271-7.)  Defendants contend that the Court's refusal to give this

instruction was error.  (ECF No. 278 at 9.)

Initially, the Court notes that Proposed Instruction Q, by its plain language, was

intended to apply only to Count 14.  As Mr. Richter and Mr. Olson, the movants here,

were both acquitted on Count 14, the Court questions whether the propriety of the failure to give Instruction Q is a moot point.  However, in a footnote in the instant Motion, Mr. Olson addresses this issue and explains why he believes Instruction Q should have been given with respect to Count 15 despite the plain statement in the proposed instruction that it applied only to Count 14.  (ECF No. 278 at 9 n.3.)  Thus, in the interest of completeness, the Court will analyze this particular issue on the merits.

As with Proposed Instruction P, discussed above, Defendants' Proposed Instruction Q requests that the Court instruct the jury on a theory of the defense.  As such, the Court was required to give this instruction "only if, without the instruction, the district court's instructions were erroneous or inadequate."  *Williams*, 403 F.3d at 1195.  With respect to the *mens reas* for Count 15, the jury was instructed that it had to find both that: (1) Defendants "fraudulently or knowingly" facilitated the transportation, sale or concealment of the CRTS prior to their exportation; and (2) Defendants "knew" the exportation of the CRTs was contrary to law in that it either required the filing of a notice of intent to export or the consent of the receiving country.  (ECF No. 271-7 at 54.)  The Court defined "knowingly" as meaning that the Defendant was "conscious and aware of his actions, realized what he was doing or what was happening around him, and did not act because of ignorance, mistake, or accident."  (*Id*. at 57.)

The Court finds that it was not required to include Defendants' Proposed Instruction Q in the set of Instructions provided to the jury in this case because the jury had already been properly instructed on the *mens rea* element of Count 15.  That is, the jury was instructed that, in order to convict the Defendants on Count 15, it had to find that they did not act out of ignorance, mistake or accident with respect to whether the

exportation of the CRTs was unlawful.  Assuming, as the Court must, that the jury

followed these instructions, it could not have found Defendants guilty on Count 15 if the

jurors believed that Defendants did not know that exportation of the CRTs either

required a notice of intent to export or the consent of the receiving country.  The

proposed good faith instruction is the other side of the same coin and, therefore, the

Court's instructions were not erroneous or inaccurate simply because the Court

declined to include Defendants' Proposed Instruction Q.

The Court recognizes that it would have been within its discretion to give the jury

a good faith instruction with respect to the Exportation Counts.  However, because its

instructions already required the jury to find that the Defendants acted knowingly, and

knowingly was defined as acting without ignorance or mistake, in the Court's view the

good faith instruction was not required in these circumstances.  *See Bowling*, 619 F.3d

at 1184 (where court's instructions required that the jury find the defendant acted

"knowingly", it was not necessary to instruct the jury on the "good faith" defense).

3.    Waste Instruction

Defendants' final argument with respect to the jury instructions is that the Court's

"Waste—Defined" instruction was an incorrect statement of the law because it included

guidance from a 2004 Memorandum issued by CDPHE and that the inclusion of the

2004 Memorandum in the instruction violated Due Process.  (ECF No. 278 at 2; ECF

No. 279 at 6.)

The Court's final jury instructions included the following:

Electronic devices and electronic components can
become a "waste" in four ways:

      (1)     A used electronic device destined for disposal becomes a waste on the date it is discarded;

      (2)     A used electronic device destined for recycling becomes a waste on the date the recycler determines that the device cannot be resold, donated, repaired or refurbished, or determines that he cannot directly reuse or sell useable parts from the device.

      (3)     An electronic component becomes a waste on the date the recycler determines that the component cannot be resold, donated, repaired, or refurbished, or determines that he cannot directly reuse the component.

      (4)     An unused electronic device becomes a waste on the date the handler decides to discard it.

*For subparts (2) and (3) above, in order for an electronic device or electronic component to not be a waste, it must be resold, donated, repaired, reused or refurbished for its original intended purpose.  For example, the following would not be considered a waste:  (1) a computer monitor that is resold for continued use as a monitor, (2) a computer CPU that is refurbished for continued use as a computer, or (3) a computer chip that can be removed from one CPU and used to repair another for continued use as a computer.*

Electronic devices and components destined for materials recovery as scrap metal are considered wastes.

If an electronic device or component is not a waste, it cannot be a hazardous waste.  Thus, if you find that the materials at issue in this case were not a waste, you must find the defendants not guilty on Counts 14 and 15.

(ECF No. 271-7 at 61.)  The italicized portion was taken directly from a 2004

Memorandum issued by CDPHE for the purpose of clarifying when electronic material

was a "product" and when it was a "waste" under Colorado's Universal Waste

regulations.  This italicized portion of the "Waste—Defined" instruction is the subject of

the instant Motion.

The Court's "Waste—Defined" instruction has a long history in this case and was the subject of significant debate and analysis both before and during trial.  Defendants' proposed jury instructions on the waste determination referenced and incorporated Colorado's Universal Waste Regulations, 6 C.C.R. §§ 1007-3:273 *et seq*. ("Part 273").  (ECF No. 177 at 17, 20; ECF No. 179 at 3.)  The Government's corollary proposed instruction took its definitions from Colorado's Hazardous Waste Regulations, 6 C.C.R. §§ 1007-3:261 *et seq*. ("Part 261").  (ECF No. 178 at 12-13.)  The Government also included a portion of a 2004 Memorandum issued by CDPHE which clarified that, for an electronic material to be considered a product and not a waste, it must be reused or resold for its "original intended purpose".  (*Id*.; ECF No. 184-1.)

Given the parties' divergent views, the Court ordered further briefing on this issue and informed the parties that it would hear argument at the Final Trial Preparation Conference.  (ECF No. 200.)  During this argument, the primary disputes were: (1) whether the Court was required to include a definition of "solid waste" from Part 261 or whether the definitions for "hazardous waste" contained in Part 273 were sufficient; and (2) whether Part 273.2(f) of the Universal Waste Regulations had been adopted by the United States Environmental Protection Agency; and (3) if Part 273.2(f) had been adopted, whether it was pre-empted by more stringent federal regulations promulgated by the Environmental Protection Agency.

While those issues were the main focus of discussion, there was also argument regarding the role the 2004 Memorandum should play in the Court's instructions.  The Government argued vehemently that the Court should include in its instruction defining

waste at least that portion of its proposed instruction which incorporated the "original intended purpose" language from the 2004 Memorandum.  Mr. Olson's attorney stated that he objected to inclusion of the "original intended purpose" language because it was inconsistent with a provision in the Resource Conservation Recovery Act ("RCRA") and also inconsistent with the policy underlying Colorado's Universal Waste Regulations on the basis that they encourage reuse of any component of an electronic good that has commercial value.  Mr. Richter's counsel argued that the Court's waste instruction must be governed solely by the Universal Waste Regulations because that was what Defendants were on notice of before the case was commenced.

Although the Court does not typically inform parties of how it will instruct the jury until after the close of all evidence, it made an exception in this case for instructions governing the waste determination because this issue was so central to Counts 14 and 15, and would have such a significant impact on the manner in which the parties litigated these Exportation Counts.  Therefore, on November 29, 2012, the Court issued a twenty-three page opinion outlining its findings and conclusions with respect to the parties' proposed waste instructions.  (ECF No. 230.)  The Court's Order also included the portion of its final jury instructions that would govern the jury's waste determination. (*Id*. at 21-23.)

At the charge conference following the close of all evidence, the Court permitted Defendants to make a record of their objections to its final jury instructions.  Defendants renewed their objection to the Court's waste instructions arguing that inclusion of the "original intended purpose" language violated Due Process because it was came from a guidance document rather than the actual regulation.  They did not raise any new

29

issues with respect to the waste instructions.

Defendants now raise two arguments as to why the Court's inclusion of the language from the 2004 Memorandum clarifying that material must be resold, donated, repaired, reused or refurbished for their "original intended purpose" was error: (1) it improperly expanded the scope of the Universal Waste regulations such that Defendants were deprived of Due Process because they were not on notice of the criminality of their actions; and (2) it was not a correct statement of the law because the 2004 Memorandum from which this language was taken had not undergone did not have the force and effect of law.  (ECF No. 278.)

    a.   *Due Process*

With respect to the first argument—that the Court's instruction improperly broadened the coverage of the Universal Waste Regulations in violation of Defendants' Due Process rights—the Court notes that it preliminarily addressed this issue in its pre-trial Order Regarding Jury Instructions for Counts 14 and 15.  (ECF No. 230.)  The Court stated: "the 2004 Memorandum was published approximately four years before the exports at issue in this case occurred.  As Defendants were certified universal waste handlers by the CDPHE, and their business was electronic waste recycling in a heavily regulated industry, the Court has little difficultly concluding that they had notice of the 2004 Memorandum so as to dispel any concerns regarding Due Process."  (ECF No. 230 at 18 n.9.)  The Court finds that this rationale still stands true; however, it will elaborate further to address arguments raised in the instant Motion.

Defendants contend that they were deprived of Due Process because the addition of language from the 2004 Memorandum "impermissibly revised existing law in

the midst of a criminal prosecution, an error of constitutional dimension." (ECF No. 279 at 8.) In support of this argument, Defendants cite *Bouie v. South Carolina*, 378 U.S. 347 (1964) and *Marks v. United States*, 430 U.S. 188 (1977).

In *Marks*, the defendants were charged with violation of obscenity laws for acts that occurred prior to February 27, 1973. In June 1973—some four months after the alleged criminal activity occurred—the Supreme Court decided *Miller v. California*, 413 U.S. 15 (1973), which announced new standards for when hard core pornography was protected by the First Amendment. *Id*. at 29. Trial for the *Marks* defendants commenced in October 1973 and, at that trial, the jury was instructed based on the new *Miller* standard. *Marks*, 430 U.S. at 191. The Supreme Court held that use of the *Miller* standard at trial violated Due Process because "conduct which would have gone unpunished under [the prior precedent] would result in conviction under *Miller*" and defendants did not have "fair warning that their products might be subjected to the new standards" before the criminal acts occurred. *Id*. at 194-95.

Similarly, in *Bouie*, the defendants held a "sit-in" at an all-white diner in South Carolina on March 14, 1960. The defendants were invited into the restaurant and then twice asked to leave. When they refused, the police were called and they were charged under a criminal trespass statute that forbade "entry on lands of another after notice prohibiting same." *Id*. at 349 n.1. Defendants were convicted by a jury and appealed arguing that they had not received notice that they were prohibited from entering the premises; rather, they had been invited onto the premises before they were asked to leave. *Id*. at 348-49.

31

On December 13, 1961, more than a year after defendants held their sit-in, the South Carolina Supreme Court decided *City of Charleston v. Mitchell*, 123 S.E.2d 512 (1961), which interpreted the criminal trespass statute to mean that "entry" included not only moving onto the land, but also remaining on the land after receiving notice that presence was prohibited. The court reviewing the *Bouie* defendants' appeal applied this interpretation of the trespass statute and affirmed their convictions. *Bouie*, 378 U.S. at 350 n.2.

The United States Supreme Court held that applying the *Mitchell* construction of the criminal trespass statute to the *Bouie* defendants violated Due Process because it "punished them for conduct that was not criminal at the time they committed it." *Bouie*, 378 U.S. at 350. The Court noted that, before *Mitchell*, there was no way to know that remaining on the premises after being asked to leave was a violation of the criminal trespass statute. *Id*. at 355. Nothing in the plain language of the statute put the public on notice and the *Mitchell* court's enlargement of the statute's coverage was not foreseeable under prior case law. *Id*. Therefore, the Court held: "When a similarly unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime." *Id*. at 354-55.

There are a number of key distinctions between this case on the one hand, and *Bouie* and *Marks* on the other. First, and most significantly, the changes in the law in *Bouie* and *Marks* occurred *after* the defendants engaged in the disputed conduct.

Here, the Defendants were convicted of acts that occurred between 2005 and 2009, with the shipment at issue in Count 15 taking place in March or April 2008.  (ECF No. 1 ¶¶ 12, 45.)  The Memorandum relied on by the Court to help define when electronic material became "waste" for purposes of Colorado's Universal Waste laws was issued in 2004.  (ECF No. 184-1.)  Thus, the Memorandum had been issued and was readily available to Defendants for approximately four years *before* their criminal acts occurred.

Second, the Court did not, on its own, craft an expansion of the law.  The disputed "original intended purpose" language in the Court's "Waste—Defined" instruction was not drafted by the Court; it was a direct quote from the 2004 Memorandum.  (Compare ECF No. 271-7 at 61 with ECF No. 184-1 at 3.)  Moreover, to the extent that the Court's jury instruction based on the 2004 Memorandum could be considered an expansion of the law, it was not unforeseeable to the regulated community, *i.e.*, certified universal waste handlers.  The 2004 Memorandum was issued by Joe Schieffelin, the Compliance Program Manager for Colorado's Hazardous Materials and Waste Management Division and was distributed to all electronic waste recyclers in the State of Colorado.  The 2004 Memorandum plainly stated that it was intended to "clarify" when electronic materials were considered "product" and not "waste" under the Universal Waste regulations.  (ECF No. 184-1 at 3.)  Thus, to the extent the instruction could be construed to have expanded the law, such expansion was not unforeseeable.

Finally, at trial, there was evidence introduced that the 2004 Memorandum was actually recovered from Executive Recycling's offices when the search warrant was executed in this case.  Although both Mr. Richter and Mr. Olson testified that they did

not remember seeing the 2004 Memorandum, as participants in the highly regulated hazardous waste industry, they are required to stay abreast of the relevant guidelines. *See United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 565 ("[W]here . . . obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation."); *United States v. Lachman*, 387 F.3d 42, 56-57 (1st Cir. 2004) (stating that companies in highly regulated industries are presumed to be on notice of applicable regulatory regime). The 2004 Memorandum was issued by CDPHE, the agency charged with enforcing Colorado's Universal Waste laws. Therefore, the Court finds that Defendants knew or reasonably should have known of the 2004 Memorandum well in advance of the criminal acts at issue in this case.

For all of these reasons, the Court finds that including language from the 2004 Memorandum in its "Waste—Defined" jury instruction did not violate Defendants' right to Due Process.

      b.    *The 2004 Memorandum Did Not Have the Force and Effect of Law*

Defendants also argue that the 2004 Memorandum should not have been included because it did not have the force and effect of law. (ECF No. 278 at 3.) Defendants point to a Colorado statute which provides: "No policy or guidance referred to in subsection (1) of this section shall have the force and effect of a rule unless it has been promulgated by the relevant commission pursuant to the provisions of the 'State Administrative Procedure Act'." C.R.S. § 25-6.5-102(2). Defendants contend that, because the 2004 Memorandum was not promulgated through the rule-making process, it "had no force or effect and was nothing more than an opinion by a state

34

employee of what that employee wished the law to be." (ECF No. 278 at 3-4.)

The Court notes that Mr. Olson's Motion for New Trial is the first time in these proceedings that any party is raising the issue of the legal effect of the 2004 Memorandum, *i.e.* whether it has the force and effect of law. Federal Rule of Criminal Procedure 50(d) requires a party who objects to any portion of a jury instruction to "inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." A party's grounds for objecting to a jury instruction "must be so definite as to indicate to the trial court the precise ground upon which the evidence is inadmissible or the ruling objectionable. The trial court is entitled, under this rule, to be apprised of the claimed error, to consider the contention, and to correct possible error." *Neu v. Grant*, 548 F.2d 281, 287 (10th Cir. 1977) (applying need for specific objection to any objection to the Court's jury instructions). If a proper objection is raised, the Court must review the instruction *de novo*; otherwise, the instruction is subject only to plain error review. *United States v. Keeling*, 235 F.3d 533, 538 (10th Cir. 2000).

While Defendants objected to the Court's "Waste—Defined" instruction, they did not raise the specific grounds that they are arguing here. Defendants had generally argued that the Court's inclusion of the 2004 Memorandum's "original intended purpose" language violated Due Process, but this Due Process argument was founded in the fact that the 2004 Memorandum was not in the plain language of the statute. Before Mr. Olson's Motion for New Trial, no party had discussed whether the 2004 Memorandum had the force and effect of law and no party had cited Colorado Revised Statute § 25-6.5-102. There was no argument raised that the Court should not include the 2004 Memorandum because it had not undergone the rule-making process.

35

Based on this history, the Court finds that Defendants did not properly raise the argument that the 2004 Memorandum did not have the effect of law because it had not undergone the rule-making process.  Accordingly, the Court finds that this argument has been waived and the Court will review whether its "Waste-Defined" instruction properly stated the law under the plain error standard.

To prevail under a plain error review, Defendants must show "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights."  *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007).  The Court has already issued a twenty-three page opinion setting forth the basis for why it believes the language of its waste instructions was a correct statement of the law. (ECF No. 230.)  The Court incorporates that analysis here.

Because it is a newly raised issue, however, the Court will address whether it was plain error to include the 2004 Memorandum's "original intended purpose" language even though such Memorandum had not undergone the rule-making process. It is well-established that a district court has considerable discretion in formulating the jury instructions so that they are beneficial to the jurors.  *United States v. Fox*, 902 F.2d 1508-1516 (10th Cir. 1990).  Jury instructions can be derived from a variety of sources, including non-legal sources such as a dictionary.  *See United States v. Kaufman*, 546 F.3d 1242-1261 (10th Cir. 2008) (district court's inclusion of dictionary definitions of statutory terms was not error).

Here, the Court included the "original intended purpose" language from a guidance memorandum issued by the state agency charged with interpreting and enforcing Colorado's Universal Waste regulations.  Even if the 2004 Memorandum did

not have the force and effect of law, CDPHE's interpretation of the regulations it is charged with enforcing is entitled to deference. *See Barnhart v. Walton*, 535 U.S. 212 (2002) ("Courts grant an agency's interpretation of its own regulations considerable legal leeway"). As the Court previously stated: "[T]he Court finds that the 2004 Memorandum provided interpretive guidance to the meaning of Part 272.3(f)(3) that is relevant to the jury's determination of whether the electronic materials at issue in this case were waste." (ECF No. 230 at 18.) As such, despite its legal status, the 2004 Memorandum was a useful tool in assessing when an electronic material becomes a waste. *See Kelly v. Keystone Shipping Co.*, 281 F. Supp. 2d 313, 321 n.14 (D. Mass. 2003) (finding that agency's policy letter, though not having the force and effect of law, was useful tool in interpreting regulation). Because a definitional-type instruction, such as that at issue here, need not have the force of law to be included in a jury instruction, the Court finds that its inclusion of the "original intended purpose" language from the 2004 Memorandum was not plain error.

### c.    *Effect of Any Error in Waste Instruction*

Finally, the Court finds that if inclusion of the 2004 Memorandum in the Court's "Waste—Defined" instruction was error, any such error only affected Defendants' conviction on Count 15.[8] The Court's instructions were organized such that the jury was separately instructed on each of the three categories of offenses: (1) the Fraud Counts; (2) the Exportation Counts; and (3) the Obstruction of Justice Count. The jury first received a series of instructions pertaining to the Fraud Counts, with the elements

---

[8] Any such error may also have affected Executive Recycling's conviction on Count 14. However, Executive Recycling has not filed a Motion for New Trial.

instructions followed by instructions defining the relevant terms.  (ECF No. 271-7 at 39-48.)  Notably, the term "waste" does not appear in any instruction related to the Fraud Counts.

The next few instructions give an overview of RCRA and Colorado's hazardous waste laws and specify that these laws apply to the Exportation Counts—Counts 14 and 15.  (*Id*. at 49-51.)  There is an instruction setting forth the elements for Count 14, followed by the elements for Count 15.  (*Id*. at 53-56.)  The relevant terms from these two elements instructions are then separately defined, and the Court's "Waste—Defined" instruction appears in this section.  (*Id*. at 57-63.)

The location of the "Waste—Defined" instruction within the Court's set of jury instruction plainly shows that it applied only to Counts 14 and 15.  The plain language of the "Waste—Defined" instruction furthers this point as it stated that, if the jury found that the materials at issue were not waste, then they were required to find the Defendants not guilty on Counts 14 and 15.  (ECF No. 271-7 at 55.)

Because Defendants were acquitted on Count 14, regardless of any error, they cannot be retried on this claim.  However, if the Court's "Waste—Defined" instruction was error, and such error was significant enough to warrant a new trial, such new trial would only be on Count 15.

### III.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   Defendant Tor Olson's Motion for New Trial (ECF No. 278) is DENIED;

2.   Defendant Brandon Richter's Motion for New Trial (ECF No. 279) is DENIED;

and

3.      The jury's verdict is AFFIRMED.


Dated this 21st day of May, 2013.


                                        BY THE COURT:


                                        _____
                                        William J. Martinez
                                        United States District Judge